UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Criminal Action No. 10-cr-00567-MSK

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1. **COSME MOISES GOMEZ-PAZ**,
2. **SERGIO ABRAHAM BELTRAN**,
3. **RAFAEL PELAYO-ESCARDA**,
4. **ESEQUIEL MEZA-TORRES**, and
5. **LUIS ARMANDO CELAYA**,

       Defendants.

---

## ORDER RE OPINION TESTIMONY OF SHANA IRBY

---

**THIS MATTER** comes before the Court on the Government's Motion *in Limine* for a Pretrial Determination of the Admissibility at Trial of the Anticipated Opinion Testimony by DEA Senior Forensic Chemist Shana Irby (**#160**) and the Defendants' responses thereto (#**172, 173, 175**). An evidentiary hearing pursuant to Rule 702 of the Federal Rules of Evidence was held on May 27, 2011 and August 18, 2011. Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

### I. Background

The Defendants are charged in a two-count Indictment **(#14)** with (1) conspiracy to possess with intent to distribute and distribute more than 500 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 846; and (2) possession with intent to

distribute and distribution of 500 or more grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A).

The Government proffers the opinions of Ms. Shana Irby with regard to the content of substances that she tested. In particular, she opines that 1) Exhibit 1.01 with a weight of 5,196 grams, contained methamphetamine with a purity of 99%, resulting in an actual amount of 5,144 grams of methamphetamine hydrochloride; and 2) Exhibit 1.02, with a net weight of 47.6 grams, contained methamphetamine hydrochloride with a purity of 98.9 %, resulting in an actual amount of 47.0 grams of the drug. With respect to purity measurements, there is an uncertainty factor of plus or minus 3.5%.[1]

The Defendants challenge these opinions under Fed. R. Civ. P. 702, contending that they are not the product of a reliable methodology.

## I. Evidence Presented

1. <u>Government's evidence</u>

Ms. Irby is a senior forensic chemist with the DEA's Western Laboratory, with a specialty in quality assurance. She has extensive training and experience in forensic chemical testing and in testing for methamphetamine. She also has been trained in and is familiar with standards imposed by the American Society of Crime Laboratory Directors Laboratory ("ASCLD/LAB") accreditation boards and Scientific Working Group for the Analysis of Seized

---

[1]Details of Ms. Irby's exact testing procedures and results were provided in a sworn declaration and attachments, including how she did her sampling and what chemicals and quantities she used in each test. Gov't Exh. 1.

2

Drugs ("SWGDRUG").[2] She performs internal audits of her laboratory, and external audits of other DEA laboratories to ensure compliance with these standards. [3]

On April 26, 2011, Ms. Irby tested substances represented to have been seized from Defendants. She obtained the substances (labeled as two exhibits) from the lab's evidence vault. She described how she identified, weighed the exhibits and processed the substance from the exhibits in order to ensure that they all contained the same substance.[4] This process resulted in

---

[2] According to the SWGDRUG document provided as the Government's Exhibit 2, "SWGDRUG is comprised of a core committee of more than 20 forensic scientists from around the world. The mission of SWGDRUG is to recommend minimum standards for the forensic examination of seized drugs and to seek their international acceptance." Exh. 2 at vii. It does this by, *inter alia*, specifying requirements for practitioners, promoting standards, and establishing quality assurance requirements. *Id*.

[3] According to Ms. Irby, ASCLD/LAB accreditation involves ensuring the lab is in compliance with two documents called the ISO 17025 documentation. The DEA lab is also required to be in compliance with supplemental requirements of ASCLD/LAB concerning forensic analysis. She testified that the lab was certified in 2005 and re-accredited in February 2010. She generally described the audit and accreditation process. Ms. Irby also explained that there are several documents in the laboratory, including the DEA's Analytical Sufficiency Document ("ASD"), which specify the protocols or procedures for performing a particular chemical test.

Only the SWGDRUG standards have been disclosed to the Court and to the Defendants. The Government (or more specifically, the DEA) has refused to disclose any other documents, protocols, guidelines or procedures that were used in or governed operation of DEA's Western Laboratory. Thus, for the purposes of this determination, the Court disregards their existence and Ms. Irby's compliance with any document, protocol, guideline or procedure that has not been presented to the Court and the Defense.

[4] She first weighed the two exhibits including their packaging. In the first exhibit there were two bags, one labeled as "composite" which contained fine-ground white powder and the other labeled "threshold" which had a white crystalline substance. In the second exhibit were two "larger Ziploc bags," and inside each of these bags was yet another bag labeled "bulk" and containing white crystalline substance. Ms. Irby reconfigured these and labeled them as Exhibit 1.10 (the "threshold" bag and two bags labeled "bulk") and Exhibit 1.02 (the smaller bag labeled "composite"). She then weighed the substance itself by emptying each bag, weighing each bag, and subtracting the weight of the bag from the initial weight. She then poured the substance of each bag into a separate cone and sampled the substance from five areas of the cone. These samples were ground up with a mortar and pestle to the size of 20-mesh sieve.

four sample units that were then tested.

Ms. Irby performed a series of tests, first to determine the chemical content of the samples ("qualitative testing") and then to measure the purity of those samples ("quantitative testing").

The first qualitative test Ms. Irby performed was the Marquis regent test, a "presumptive" test that indicates only whether a sample <u>might</u> contain methamphetamine.[5] Ms. Irby placed each of the four samples, a negative sample (or "blank" used to test the equipment to ensure there is no contamination), and a reference material sample[6] (or "standard") known to contain methamphetamine, in six wells. She added a reagent and found that the color change from the four samples was the same as that of the reference material. The well containing the blank showed no color change. From this, Ms. Irby concluded that her four samples contained phenethylamine, an indication that the samples could be either methamphetamine or amphetamine.

The next test involved gas chromatography coupled with mass spectrometry. This is a confirmatory test – one that more conclusively establishes the presence of methamphetamine. The instrument she used for this test was performance verified[7] monthly, the most recent

---

[5]Ms. Irby testified that according to DEA standards, chemists are to perform one confirmatory test and one presumptive test, as well as a separation technique, which shows if there is more than one substance in the mixture.

[6]In the testimony and argument the reference samples are sometimes referred to as "standards." Because this is the same term used for "protocols" and "procedures" and "requirements," to avoid confusion, the Court uses the term "reference samples" in this order.

[7] The performance verification involves running a test mix to determine if the instrument is operating correctly.

verification having been done on April 12, 2011. Ms. Irby tested each of the four units using this device. Comparing the results of this test to a reference sample, Ms. Irby found that the four units all contained methamphetamine.

The next tests performed were infrared spectroscopy ("IR") and attenuated total reflectance ("ATR") tests on two of the combined samples (the composite sample Exhibit 1.02 and a sample from compounding of the units comprising Exhibit 1.01). In these confirmatory tests, a substance sample is placed on a diamond window on the instrument through which infrared light is shined. The light is absorbed or reflected from the sample, resulting in a unique pattern or spectra that indicates its chemical components. The machine that she used for this test had been most recently performance verified on April 1, 2011. Ms. Irby conducted the test by first operating the instrument with no substance sample (blank) on the diamond window to confirm that the instrument was not contaminated. She then examined the first sample, comparing its spectra against a library reference standard, finding it to contain methamphetamine hydrochloride. She performed the blank test again to ensure no contamination from the first sample, and proceeded to test the second sample, finding it to have the same spectra, and thus, the same contents.

Ms. Irby then tested substance samples using gas chromatography with infrared detection, another confirmatory test. The instrument used for this testing had been performance verified on April 12, 2011. She used a blank before conducting each test. The results of this test also showed that the samples contained methamphetamine.

Finally, she tested the substance samples using gas chromatography with flame ionization, to identify the isomers of the substance. The instrument she used had been

performance verified on April 19, 2011. She used a blank before running each substance sample, and then ran three known reference samples containing methamphetamine. She compared the test results from her samples to the results from the reference samples and concluded that the substance being tested was methamphetamine.

To determine the purity of the substance - and thereby determine the quantity of it that was methamphetamine - Ms. Irby used a liquid chromatography instrument last performance verified on April 4, 2011. She tested substance samples, but did not use a negative control (blank) before testing the samples. She testified that she did not use a blank before testing because she already knew that the substance contained methamphetamine, and thus, she was not worried about the instrument giving a false positive result. After processing the samples, she visually compared the results against a known reference sample of methamphetamine at a specific concentration. Using simple math, she applied the concentration of the reference sample to determine the weight of each exhibit.

With respect to each of these tests, Ms. Irby stated (and referred to documentary evidence showing) that they have been in use for a many years,[8] are approved by the DEA and SWGDRUG, have been peer reviewed, and are generally accepted methods used by forensic chemists to test unknown substances for the presence of methamphetamine.

Ms. Irby was examined and cross-examined about the exact lab protocols she used while performing each of the tests as described above. She stated that she applied a variety of lab standards and protocols, including those of SWGDRUG, ASCLD/LAB, ISO 17025, and

---

[8] Nearly all of the tests have been used by the DEA since 1973, although the ATR has been used for the last twelve years.

protocols set forth in DEA Analytical Sufficiency Documents, among others. However, it was undisputed that the Government – more specifically, the DEA – was unwilling to produce documentation for the record[9] regarding any protocols other than SWGDRUG. As discussed below, the Court declines to entertain any testimony from Ms. Irby regarding her alleged compliance with protocols that the Government refuses to disclose, and thus, the Court finds that Ms. Irby's testimony regarding adherence to lab protocols is limited to her statement that "I know in my head the protocol that we take to analyze the sample. So I didn't refer to the document and, say, Oh I have to do this step, this step, this step. I'm not a technician; I'm a chemist. I can use the discretion of my knowledge and my experience in analyzing these drugs to carry about my analysis. I don't have a recipe that I follow; however, I do have requirements that I have to meet in my analysis." Tr., 5/27/11 (#**200**) at 78.

With respect to known reference samples (*i.e*., samples known to contain methamphetamine), she explained that these come from DEA and are traceable by standard number (similar to a lot number). She was not able to testify regarding the source of each reference sample nor how or when each was verified, but she believed that they are re-verified every three years. Ms. Irby testified that while some reference samples might degrade over time, to her knowledge, methamphetamine does not.

The Government also presented testimony by Scott Oulton, a forensic chemist who serves as the Associate Deputy Assistant Administrator for the DEA. At the time of his

---

[9]After the issue of non-disclosure arose at the hearing, the Government offered to produce some of the items, including the ASD, but only subject to a protective order and non-disclosure conditions, including that all copies be returned at the conclusion of the hearing with the Court's copy to remain under seal. Counsel for the defendants ultimately refused the documents on those terms.

testimony, Mr. Oulton was also the chair of SWGDRUG. He testified that he had reviewed Ms. Irby's laboratory report and attached documents. Based on SWGDRUG policies, he opined that Ms. Irby reliably applied the testing methods to the substance she tested. SWGDRUG policies mandate at least two qualititative tests to identify a drug, but Ms. Irby performed six qualitative tests, all of which yielded conforming results. He corroborated Ms. Irby's testimony that the methods and instruments she used are well tested, peer reviewed, and generally accepted in the scientific community. In addition, he stated that the parameters she used (*e.g.*, how the instruments were set) were in compliance with recognized ranges in the forensic chemistry field.[10] With respect to the error rate of the test results from these methods, Mr. Oulton testified that "what SWGDRUG says is as long as you apply appropriate method and, [but] for unforeseen circumstances or human error -- and you do the right number of tests and you do the right tests and you understand those limitations, there is effectively no uncertainty in reported identifications." Tr., 8/18/11 (**#240**), at 233.

    2. Defendants' evidence

The Defendants presented the testimony of Janine Arvizu, a laboratory quality auditor and consultant. In that role, she routinely evaluates the reliability of laboratory testing procedures and protocols to enable clients to assess whether test results are reliable. She is not a forensic chemist and has no experience in performing the tests described by Ms. Irby. However,

---

[10] Mr. Oulton testified generally about categories SWGDRUG uses to rate different testing methods, based on how discriminating the method is in identifying the exact substance contained in a sample. Most of the methods used by Ms. Irby, including mass spectrometry, were Category A tests, meaning they are highly discriminatory in separating and identifying the exact molecular components of a mixture. The Marquis reagent test, a Category C test, is only capable of identifying a class of substances and so is considered less discriminatory.

she testified that the adequacy of laboratory quality control measures is applicable to forensic chemical analyses such as those conducted by Ms. Irby.

Ms. Arvizu opined that neither Ms. Irby's testimony nor her report confirmed that the tests conducted were in conformance with accepted scientific standards applicable to forensic laboratories. She noted the absence of documented procedures or a detailed account of what Ms. Irby did in several respects. For example, Ms. Arvizu testified that Ms. Irby's report contained no detailed information stating the specifications of the instruments she used or demonstrating that they met technical performance requirements. In addition, Ms. Arvizu explained that knowing how a mass spectrometer is tuned is essential in determining whether the results obtained from that instrument are reliable, but Ms. Irby's reports and testimony did not reflect this information. She further noted that the performance of testing equipment can be affected by whether it was adequately warmed up and ready to operate, but no information regarding this issue was evident. In the absence of confirmatory data of this type, Ms. Arvizu testified that she, as a laboratory auditor, would assume that essential steps were not completed and that the resulting test was therefor unreliable.

With respect to the use of reference samples and blanks, Ms. Arvizu testified that with infrared spectrometry and gas chromatography, the accepted practice in the scientific community is to test a known reference sample with every test of an unknown sample in order to ensure that the machine is operating correctly. She testified that it was important to know the source of the reference sample, so that it can be traced and verified. She opined that there was insufficient information to determine whether Ms. Irby used reliable reference samples or used them in the proper manner. She testified that in her experience and knowledge, reference samples of

9

methamphetamine have a shelf life, an expiration date of sorts, after which they may not be reliable. Although re-verifying the sample every three years might suffice to ensure the quality of the reference sample, quality issues might raised by how well the reference sample is stored and maintained during those three years, making information regarding routine handling of those reference samples important to know.

Ms. Arvizu opined that running a reference sample at a time other than during actual testing is inadequate. She also disagreed with Ms. Irby regarding whether the analysis using the liquid chromatography instrument required the use of a blank to ensure that there was no contamination in determining the purity of the substance tested.

With respect to specific test results, Ms. Arvizu criticized the failure to report the threshold readings against which Ms. Irby compared her data. She opined that the gas chromatography mass spectrometry test performed by Ms. Irby was not sufficiently discriminating to state with certainty that the substance tested was methamphetamine. Rather, Ms. Arvizu testified that the method used by Ms. Irby was sufficient for a tentative identification but not for confirmation.

### 3. Government's rebuttal evidence

On rebuttal, Mr. Oulton testified that positive controls were used on all the instruments and he disagreed with Ms. Arvizu regarding the need for positive reference samples to be run contemporaneously with each test. He opined that the evidence showed that the instruments' measurements, such as retention time for the mass spectrometer, were shown to be stable and therefore running positive reference samples contemporaneously with each test was unnecessary. He agreed with Ms. Irby that because the qualitative tests had shown that the substance tested

was methamphetamine with no other chemicals apparently present there was less concern about contamination in the quantitative/purity analysis. As a result, he agreed with Mr. Irby that there was no need to use a blank in the quantitative analysis.

## II. Analysis

A.     **Requirements of Rule 702 in General**

Fed.R.Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 imposes on the trial court a "gatekeeper" obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). As currently formulated, Rule 702 not only requires the witness to have appropriate qualifications and expertise, but also requires a demonstration that the process by which the witness derived his or her opinions is reliable. *United States v. Crabbe*, 556 F.Supp.2d 1217, 1220 (D. Colo. 2008). Rule 702 sets out four foundational requirements. First, that the witness have requisite experience, knowledge, training, education or skill.[11] In addition,

---

[11] The prior version of Rule 702 required only this. As a consequence, once the witness was qualified, he or she was free to opine as to anything that fell within the scope of his or her expertise. The current version of Rule 702, adopted in response to *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589 (1993), expands the foundational requirements for expert testimony. In a sense, it shifts the analysis from being "expert centric" to "opinion/testimony centric."

Rule 702 requires that the testimony or opinion (1) be based upon sufficient facts or data[12], (2) be the product of reliable principles and methods[13], and (3) be the result of a reliable application of the principles and methods.

In the Tenth Circuit, determination of the sufficiency of the foundation under Rule 702 requires factual findings, preferably made after an evidentiary hearing. *Dodge,* 328 F.3d at1222. Such hearings are conducted in accordance with F.R.Evid Rules 104 and 1101. The proponent of the testimony, here the Government, has the burden to demonstrate the required foundation by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1251 (10th Cir.

---

[12]In the Tenth Circuit, determining the sufficiency of the facts or data is a quantitative, not qualitative, analysis. Advisory Committee Notes to 2000 Amendments; *see also United States v. Lauder*, 409 F.3d 1254, 1264 n. 5 (10th Cir. 2005). This inquiry examines only whether the witness obtained the amount of data that the methodology itself demands. *Crabbe*, 556 F.Supp.2d at 1223.

[13]In determining the reliability of the principles and methods, the district court is granted a certain degree of flexibility but fundamentally must examine whether the opinion is grounded in scientific or logical methods that can be replicated and validated. This requirement had its genesis in *Daubert*, 509 U.S. at 590, where the Supreme Court in *Daubert* suggested four nonexclusive factors that the trial court may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. However, since then, many courts have explored a variety of factors that bear upon the reliability of a principle or methodology. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141–42, 152 (1999) (trial court should consider factors identified in *Daubert* "where they are reasonable measures of the reliability of expert testimony" but court has discretion to determine *how* to make the reliability determination; the central objective is to ensure that any expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000) (in addition to *Daubert* factors, court might consider relationship of technique to methods established as reliable and nonjudicial uses to which method has been put); *United States v. Garza*, 566 F.3d 1194 (10th Cir. 2009) (noting that expert opinion may be admissible even if none of the *Daubert* factors are met but where expert has acquired specialized knowledge through experience, such as police officers opining regarding criminal practices).

2009). The scope of this 702 hearing is limited to determining the adequacy of the foundation of the opinion or testimony, and the proponent need not prove that the proffered opinion is objectively correct, persuasive, or that it should enjoy any particular weight. *See Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir.1999). The Court does not make an ultimate determination of the admissibility of the testimony or opinion, because other challenges to admissibility may later be made.[14] However, inadequacy in proof of required foundation renders the affected opinion inadmissible. *Mitchell*, 165 F.3d at 782.

### B. The Issue Presented - Reliable Application of a Reliable Methodology

The Defendants do not challenge Ms. Irby's qualifications, whether the tests she conducted were reliable methods to determine the existence and amount of methamphetamine in an unknown substance, or the sufficiency of facts and data that she considered; their challenge is to whether the Government has satisfied its burden to show that the tests – *i.e.* the methodology – were reliably performed.[15]

The Defendants do not contend that the tests Ms. Irby performed were themselves unreliable or inappropriate; rather, Ms. Arvizu's testimony was limited to observing that she was unable to ascertain whether, when conducting those tests, Ms. Irby followed lab protocols and standards that are necessary to ensure that the tests produce reliable results (which, in turn,

---

[14] For example, whether the Government can show a proper chain of evidence to establish that the substances Ms. Irby tested were the same as those seized from the Defendants has no bearing on the determination of whether the Government can show that Ms. Irby's opinion has a reliable foundation.

[15] As discussed herein, the Defendants' challenge to whether the methodology was reliably applied might also be construed as a challenge to the sufficiency of the methodology itself.

would cause Ms. Arvizu to assume the results of the tests are unreliable). In this sense, it may be more accurate to describe the Defendants' challenge as being to the methodology applied by Ms. Irby – that is, the various calibration, verification, and other steps called for in lab protocols constitute additional steps in the methodology, steps that Ms. Irby's testimony failed to address.

The question of whether the protocols cited by Ms. Arvizu are essential components of the methodology (or, to the extent one construes them as bearing on the question of application, whether an otherwise reliable methodology was reliably applied) is of particular significance in this case, given the Government's refusal to identify the contents of most[15] of the protocols Ms. Irby employed. There is an argument to be made that where the Government on one hand urges the Court (or the factfinder) to accept the representation that Ms. Irby fully complied with such protocols, standards or procedures, while on the other hand the Government simultaneously refuses to supply evidence of the contents of those protocols and standards, the Defendants' rights under the Sixth Amendment are implicated. *See generally United States v. LaVallee*, 439 F.3d 670, 692 (10th Cir. 2006). The Court does not have to reach that thorny constitutional question at this time,[16] as it has resolved any potential Confrontation Clause issue by refusing to

---

[15]The Government has produced the SWGDRUG protocols, but those appear to be general in nature (exhorting labs to, for example, create a documented quality management system and designate individuals to have roles in ensuring quality assurance).

[16]Should this matter proceed to trial, the Court would likely preclude Ms. Irby from testifying that her tests were conducted in conformance with any particular protocol or set of standards that the Government has not disclosed to the Defendants. Ms. Arvizu would be free to testify that, in her opinion, reliable lab results can only be obtained when specifically-described lab procedures and practices – *e.g.* particular calibration intervals, specific schedules for verifying the integrity of reference samples, etc. – are followed, and Ms. Irby would be free to testify (and be cross-examined regarding) the actual lab procedures and practices she followed in these regards. Ms. Irby can also testify by proxy, asserting more generally that she followed the dictates of a given protocol or standards document (rather than painstakingly listing all of the

14

consider references by Ms. Irby to protocols that have not been produced. Indeed, Ms. Irby herself testified that she did not refer to any of the undisclosed protocols or other documents in performing the tests, relying instead on her understanding of the principles of chemistry involved in the testing and her general experience in performing lab tests. Thus, the Court limits its inquiry into the sufficiency of Ms. Irby's methodology (or the reliable application thereof) to the question of what Ms. Irby <u>actually did</u>, not whether what she did was consistent with some unknown protocol or practice.[17]

Thus, the question presented by Ms. Arvizu's testimony is whether Ms. Irby's largely generalized testimony concerning her compliance with commonly-accepted lab protocols and standards is sufficient to carry the Government's burden of showing that Ms. Irby's methodology (or the application thereof) is sufficiently reliable.

This issue invokes what courts have often referred to as "laboratory error." As the court explained in *United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 19976, "the reliability of the proffered test results may be challenged by showing that a scientifically sound methodology has

---

particular acts she performed as directed by that protocol or standard), so long as that document has been produced to the Defendants. However, the Court will not permit Ms. Irby to offer the conclusory statement that she followed a particular protocol or standard if that protocol or standard has not been produced to the Defendants.

[17]For this same reason, the Court disregards whether the DEA Western Laboratory was accredited by ASCLAD/LAB or had compliance problems with its standards. Not only is accreditation retrospective, it does not address the particular testing that was performed by Ms. Irby.
The same reasoning explains why the Court has given limited weight to Mr. Oulton's testimony, except as to his knowledge of the development and implementation of SWGDRUG standards. He has no first hand knowledge of what Ms. Irby did. The Court also disregards evidence with regard to testing conducted by Ms. Chan, independent of that conducted by Ms. Irby.

15

been undercut by sloppy handling of the samples, failure to properly train those performing the testing, failure to follow the appropriate protocols and the like." However, most cases have found that laboratory error typically bears on the <u>weight</u> to be given to a particular test result, not on its <u>reliability</u> for Rule 702 purposes.[18] *See e.g. United States v. Ewell*, 252 F. Supp. 2d 104, 113-14 (D.N.J. 2003); *United States v. Morrow,* 374 F. Supp. 2d 51 (D.D.C. 2005); *United States v. Shea*, 957 F. Supp. 331 (D.N.H. 1997); *see also United States v. Moreland*, 437 F.3d 424 (4th Cir. 2006). Admittedly, there may come a point where laboratory error is so prevalent and profound "as to skew the methodology itself," but absent such an extreme showing, laboratory error does not preclude admission of the evidence on Rule 702 grounds, and is merely something for the finder of fact to weigh. *Ewell*, 252 F. Supp. 2d at 113.

The Court finds that Ms. Arvizu's criticism of Ms. Irby's potential laboratory error does not rise to the level of fundamentally implicating the reliability of the well-established testing methodology Ms. Irby employed. Although there is relatively little testimony from Ms. Irby addressing the quality assurance concerns raised by Ms. Arvizu – that is, testimony concerning frequency of tuning, verification of reference samples, and the like – Ms. Irby did testify that she is trained and experienced in performing the tests properly and in employing appropriate quality controls. She testified that she performed the tests in accordance with her experience and training, and gave some specific testimony regarding issues of instrument verification and use of blanks and reference samples. Ms. Irby's undisputed experience and expertise, coupled with her testimony that she performed the tests consistent with the standards and practices that her

---

[18] The Court notes, however, that in these cases the law enforcement agency (most often the FBI) was forthcoming with information about the protocols and procedures used in its testing.

experience has shown to be common and acceptable among chemists, is sufficient to render the question of compliance with good lab protocol to be one of weight, not fundamental reliability.

The showing also survives challenge under a preponderance of the evidence standard. Ms. Arvizu lacks expertise as a forensic chemist and experience performing these particular tests. Her expertise is in auditing the procedures and protocols used by laboratories on a systemic basis, rather than assessing the correct performance of a single test or group of tests. Although couched in terms of scientific reliability, it is clear that the quality control issues identified by Ms. Arvizu pertain to whether Ms. Irby's report or testimony demonstrated use of adequate laboratory procedures and protocols in a generalized sense. In most respects, Ms. Arvizu's testimony was not that Ms. Irby performed her test in an unreliable way, but rather that Ms. Arvizu was unable to ascertain what background protocols Ms. Irby or the lab employed in performing the tests. Consistent with her expertise in auditing, not chemistry, Ms. Arvizu's testimony is best understood as indicating that she lacks sufficient information to be able to vouch for the reliability of Ms. Irby's results, not as contending that Ms. Irby performed the test incorrectly or misread the results. To crystalize the dispute, Ms. Irby has testified that she performed the tests reliably; Ms. Arvizu testifies that she cannot be certain that that is correct. Ms. Arvizu's reticence to confirm Ms. Irby's conclusions is thus not sufficient to place the parties' evidence in equipoise.

With regard to Ms. Irby's quantitative opinion regarding the purity/quantity of the methamphetamine, the question is closer. Several of the qualitative tests suggested high concentrations of methamphetamine, but only one test was conducted to determine its concentration - liquid chromatography. In this test, Ms. Irby admittedly did not use a "blank" to

17

confirm the accuracy of the instrument prior to testing. Although there was not clear testimony as to why a blank might or might not be used in such a test, the Court understands that purpose of using a blank is to ensure that the instrument is not giving an inaccurate reading due to contamination from previous tests. In the context of this case, the use of a blank has most thoroughly been explored in the context of quantitative testing - where contamination of an instrument might give a false positive reading as to the existence of methamphetamine. Ms. Irby testified that because the presence of methamphetamine had already been determined, she was not concerned that contamination of the instrument used for the quantitative test would give a false positive – that is, report the presence of methamphetamine when it was not actually present. Mr. Oulton confirmed that view on rebuttal.

Ms. Arvizu testified, in general, that a failure to insure any instrument is not contaminated by prior testing can affect its results. The logical extension of this testimony is Ms. Arvizu's contention that some confirmation (by use of a blank or otherwise) should have been made to ensure that the instrument used for the liquid chromatography test had not been contaminated by prior testing. Unfortunately, the evidence of record does not address the workings of the liquid chromatography test nor how the instrument's accuracy is assured. Thus, the Court is left with a categorical denial of the need to use a blank by the forensic chemists familiar with use of the particular instrument and the logical inference from Ms. Arvizu that some type of verification of the instrument's accuracy should have, but may not have, been made.

Applying the preponderance of the evidence standard, again the Government's evidence squeaks by, not because it has explicated the workings of the particular instrument nor

18

demonstrated that quality control was assured, but simply because no challenge has been made to the expertise of Ms. Irby and Ms. Arvizu does not have correspondingly specific expertise and has not specifically addressed why a blank would still be necessary where qualitative tests had already been conducted. Accordingly, the Defendants' objections bear on the question of the weight to be given the results of the quantitative test, and can be raised at the time of trial.

**IT IS THEREFORE ORDERED** that

(1) Defendants' Rule 702 objections to the expert testimony and opinions of Ms. Irby are overruled. The evidence proffered by the Government satisfies the foundational requirements of Rule 702.

(2) The parties have ten days from the issuance of this order to file any supplements, based on the issues determined here, to the pending motions for discovery.

(3) A Final Pretrial Conference is set for October 27, 2011 at 9:00 a.m.

Dated this 16th day of September, 2011

                                            **BY THE COURT:**

                                      Marcia S. Krieger
                                      United States District Judge